UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| **JULIE CAMPBELL, KEITH SADAUSKAS, DIANA BICKFORD, and KERRIE MULHOLLAND, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 22-CV-2261** |
| **SIRIUS XM RADIO, INC.,** | ) ) ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiffs Julie Campbell, Keith Sadauskas, Diana Bickford, and Kerrie Mulholland filed the putative class action Complaint (#1) in this case on November 29, 2022. Therein, Plaintiffs allege that Defendant, Sirius XM Radio, Inc., committed violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227 et seq.—as well as state law analogs in Illinois, Washington, and North Carolina—in that it, inter alia, engaged in a business model of placing unsolicited telemarketing calls to persons who had listed their telephone numbers on the National Do-Not-Call Registry.

Presently before the court is Defendant's combined Motion to Strike Class Allegations and partial Motion to Dismiss (#6), filed on February 15, 2023. Plaintiffs filed a combined Memorandum in Opposition (#9) on March 1, 2023. For the reasons set

forth below, Defendant's Motion to Strike Class Allegations is DENIED and its partial Motion to Dismiss is GRANTED.

## BACKGROUND

The following facts are taken primarily from the allegations in Plaintiffs' Complaint. Where, as here, a defendant seeks to preemptively strike class allegations on the face of the complaint prior to the plaintiff's motion for class certification, the court accepts the plaintiff's allegations supporting class certification as true and draws all reasonable inferences in the plaintiff's favor. *Chicago Car Care Inc. v. A.R.R. Enterprises*, 2021 WL 1172262, at *4 (N.D. Ill. Mar. 29, 2021). Similarly, in considering a motion to dismiss, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

Many of the facts in this section are also drawn from the proceedings in *Buchanan v. Sirius XM Radio, Inc.*, Case No. 17-cv-728 (N.D. Tex. Jan. 14, 2020). It is well-established that courts may "take judicial notice of the actions of other courts or the contents of filings in other courts." *Daniel v. Cook Cnty.*, 833 F.3d 728, 742 (7th Cir. 2016).

<u>The TCPA[1]</u>

Consumers who do not want to receive telemarketing calls may indicate their preference by registering their telephone numbers on the National Do-Not-Call

---

[1] The Complaint makes copious references to the requirements of the TCPA and related federal regulations. The court will discuss these provisions at the outset, as they provide an integral backdrop for understanding both Plaintiffs' claims and Defendant's argument.

Registry. 47 C.F.R. § 64.1200(c)(2). Regulations implementing the TCPA also require entities to maintain internal do-not-call registries. 47 C.F.R. § 64.1200(d). Once an entity receives a request from a telephone subscriber not to receive calls, the number must be placed on the entity's internal do-not-call registry within a reasonable time, not to exceed thirty days from the date of the request. *Id*.

Subject to certain exceptions, telemarketers may not place phone calls to numbers on the National Registry or their internal registry. One such exception applies where there exists an established business relationship ("EBR"). 68 F.R. 44144, ¶ 83 (2003); 16 C.F.R. § 310.4(b)(1)(iii)(B)(2). "An 'established business relationship' depends on 'the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call.'" *United States v. Dish Network L.L.C.*, 954 F.3d 970, 979 (7th Cir. 2020) (quoting 16 C.F.R. § 310.2(q)(1)).

<u>Defendant's Practices</u>

Defendant has "for years" engaged in the regular practice of placing unsolicited telemarketing calls urging people who have purchased or leased vehicles to sign up for Defendant's satellite radio service, Sirius XM Radio. While those vehicles come with a free trial of Defendant's service, Plaintiffs assert that this does not establish a business relationship between Defendant and car-buyers.

Plaintiff Campbell, a citizen of Illinois, purchased a new car in February 2017. The car came with Sirius XM Radio pre-installed, an option that Campbell did not request and could not refuse. The dealership from which Campbell purchased her car

provided Defendant with her cellular phone number. From August 2017 through October 2020, Campbell received phone calls approximately once every two months from Defendant "with offers for her to become a Sirius XM customer." Campbell asked the company to stop calling her after the first such call, but the phone calls continued.

Plaintiff Sadauskas, a citizen of Washington, registered his cellular phone number with the National Do-Not-Call Registry in 2010. He purchased a new car sometime in 2019. From approximately May 2019 through sometime in 2022, Sadauskas received phone calls from Defendant four to five times per month, with offers for him to become "a paying customer." Sadauskas requested that he be added to Defendant's internal do-not-call registry in August 2019, but the phone calls continued.

Plaintiff Bickford, a citizen of Maine, registered her cellular phone number with the National Do-Not-Call Registry in 2007. She purchased a new car in June 2021. The car came equipped with an "unconfigured Sirius XM Radio installation," a service that Bickford did not request and could not refuse. After Defendant received Bickford's phone number from the car dealership, Bickford began receiving phone calls from Defendant in September 2021 and continuing through July 2022. The calls, which relayed offers for Bickford to become a paying customer, occurred three to four times per month. During one such call, Bickford asked that Defendant stop calling her and add her to its internal do-not-call registry, but the phone calls continued more than 30 days after her request.

Plaintiff Mulholland, a citizen of North Carolina, purchased or traded for new vehicles in 2014, 2017, and 2018. She registered her cellular phone number with the National Do-Not-Call Registry in April 2019. In 2020 and 2021, she received a marketing call from Defendant "a few times a week." The phone calls stopped only after Mulholland blocked dozens of phone numbers from which the marketing calls were originating.

Defendant's Prior Settlement

While the Complaint makes reference to two TCPA class action settlements into which Defendant has entered in the past decade, only that settlement in *Buchanan* is relevant to the instant Order. In that case, the plaintiff filed a class action complaint alleging that Defendant and its telemarketers violated the TCPA by not complying with the TCPA's National Do-Not-Call Registry and internal do-not-call registry requirements.

Defendant would ultimately enter into a settlement agreement whereby it paid $25 million into a settlement fund. Also as part of that settlement agreement, Defendant agreed to, per the instant Complaint, "alter some of its telemarketing practices, including providing notices contained in its Customer Agreement, glove box materials and welcome kit to explain that consumers may be contacted and explaining how consumers can take steps to place themselves on Sirius XM's internal DNC list."

The actual settlement agreement (#9-4), of which this court takes judicial notice, holds that Defendant "shall implement" six "changed business practices." The first three refer to Defendant's practices with respect to the internal do-not-call registry, while the last three, more relevant here, required as follows:

> d. Sirius XM shall ensure that its Customer Agreement has an easily visible and clear explanation that trial subscribers have a business relationship with Sirius XM that may result in Sirius XM calling them; the Customer Agreement shall also provide an explanation of how Sirius XM communicates with consumers, and shall provide notice to consumers that Sirius XM may call them regarding their service and trial or other subscription, a URL where consumers may manage their contact preferences and an 800 number they may call for customer service.

> e. Sirius XM shall modify the timing of its telemarketing calls to ensure that Sirius XM does not make calls to trial subscribers until a reasonable period of time after the mailing of the welcome kit (which shall include a copy of the Customer Agreement or, if the welcome kit is delivered electronically, a link to the Customer Agreement).

> f. Sirius XM shall, wherever possible, include in vehicle material that provides subscription details an [sic] explanation of how Sirius XM communicates with consumers, and shall provide notice that Sirius XM may call them regarding their service and trial or other subscription, a URL where they may manage their contact preferences and an 800 number they may call for customer service.

The settlement agreement also makes clear that an EBR defense was Defendant's primary defense to the TCPA charges.

Following the settlement, Buchanan moved for the approval of attorneys' fees, expenses, and a service award (#9-7). In that motion, Buchanan, via class counsel, detailed the changed business practices called for by the settlement agreement, which he referred to as "hard-fought" and "meaningful." He then stated: "Plaintiff agrees that Sirius XM has taken substantial steps to communicate its calling practices to trial

6

subscribers and that in so doing Sirius XM has enhanced its EBR defense upon which it relies on calling trial subscribers to market paid subscriptions." Attorneys' fees were awarded in the sum of $6,471,000.

Returning to the Complaint in the instant case, Plaintiffs allege that Defendant has "failed to implement practice changes sufficient to comply with the TCPA."

Finally, and central to Defendant's motion to strike in this case, Plaintiffs here are represented by three of the same attorneys and two of the same law firms that participated and were awarded fees in *Buchanan*.

Class Allegations

The Complaint raises two claims under the TCPA: violation of national do-not-call provisions (Count I) and violation of internal do-not-call provisions (Count II). Count III raises a claim under the Illinois Telephone Solicitations Act, 825 Ill. Comp. Stat. 413 et seq. The remaining counts raise claims under similar laws in North Carolina (Counts IV and V) and Washington (Count VI).

The Complaint proposes a number of classes and subclasses, varying based on the TCPA provision or state law in question and the individual plaintiffs. The only proposed class at issue in Defendant's Motion to Strike Class Allegations is the "Post-*Buchanan* National Do-Not-Call Registry Class," which is defined as follows:

All natural persons in the United States who purchased a car after the *Buchanan* Approval Date, received more than one telephone solicitation call in a 12-month period on their residential phone number telemarketing Sirius XM's satellite radio service the *Buchanan* Approval Date [sic] and more than 31 days after registering their telephone number with the National Do-Not-Call Registry, and did not purchase Sirius XM's

satellite radio service.

## ANALYSIS

<u>Motion to Strike Class Allegations</u>

"[M]otions to strike class allegations are generally regarded as premature because the shape and form of the class is to be given time to evolve through discovery." *DuRocher v. Nat'l Collegiate Athletic Ass'n*, 2015 WL 1505675, at *4 (S.D. Ind. Mar. 31, 2015). For that reason, and because the motion for class certification is considered the more appropriate vehicle for such arguments, motions to strike class allegations are disfavored. *Brown v. Swagway, LLC*, 2017 WL 899949, at *1 (N.D. Ind. Mar. 7, 2017); see also *Chenensky v. N.Y. Life. Ins. Co.*, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011) ("Motions to strike are generally looked upon with disfavor, and a motion to strike class allegations is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of litigation before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." (cleaned up)). Still, the striking of class allegations may be appropriate where those allegations are facially and inherently deficient. *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014).

To obtain class certification under Federal Rule of Civil Procedure 23, a plaintiff must satisfy the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b). *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).

*Defendant's Argument*

In its Motion to Strike, Defendant takes issue with only one of these elements: adequacy of representation. Specifically, Defendant contends that Plaintiffs' attorneys are unable to adequately represent the post-*Buchanan* class because "their representations to a sister federal court in the *Buchanan* fee motion . . . cannot be reconciled with what they allege here."

The conflict identified by Defendant concerns the proposed practice changes contemplated in the *Buchanan* settlement agreement, counsels' representations with respect to those changes, and the allegations of the post-*Buchanan* class in the instant case. Practice changes d, e, and f in the settlement agreement concerned changes Defendant would make in its provision of materials to and communications with trial subscribers, changes that *Buchanan* counsel asserted would "enhance[] [Defendant's] EBR defense." Counsel also described the contemplated practice changes generally as "meaningful" and providing "significant additional value" to the class.

The post-*Buchanan* class in this case is comprised exclusively of individuals who purchased a vehicle after the *Buchanan* settlement, and who thus would have been exposed to the practice changes implemented pursuant to that settlement. Thus, Defendant argues, the same attorneys who once lauded the value of the concessions in *Buchanan*, including specifically with respect to an EBR defense, "cannot now argue that the *Buchanan* Settlement is not 'sufficient to comply with the TCPA,' that it mandated only 'supposed' practice changes, or that its revised practices are not 'sufficient for Sirius XM to form an EBR,' all as alleged in the Complaint."

10

The court notes that Defendant predominantly casts its argument as an ethical one, characterizing counsels' course as "straightforwardly unethical" or "misconduct." Defendant also makes reference to judicial estoppel, though it is unclear if it takes the position that counsel should be legally barred from bringing claims on behalf of the post-*Buchanan* class.

*Plaintiffs' Arguments*

Plaintiffs raise three primary arguments in response, the first two of which are based on their contention that there is "no conflict whatsoever between the representations *Buchanan* counsel made to the *Buchanan* court and Plaintiffs' allegations here." First, Plaintiffs assert that the instant allegation is *not* that the negotiated practice changes were insufficient, but rather that "there was a deficiency in the implementation of practice changes."

Second, Plaintiffs argue that even if the practice changes contemplated in the *Buchanan* settlement agreement were wholly and sufficiently implemented, counsel is that case *never* asserted that those practice changes would fully "immunize" or insulate Defendant from future TCPA liability. At most, they averred that the changes "enhanced [Defendant's] EBR defense." Moreover, they argue that those practice changes can be "meaningful" and "valuable"—as asserted by counsel in *Buchanan*— while not being in "conflict" with an allegation that they were nevertheless insufficient to establish an EBR defense.

Third, Plaintiffs argue that even if Defendant's premises are presumed correct—i.e., that counsel represented to the *Buchanan* court that the practice changes were sufficient to establish an EBR defense and that counsel are now taking the opposite position—Defendant's ultimate conclusion is still incorrect. That is, attorneys are free to zealously advocate for their clients even where it requires them to take a position opposed to those taken on behalf of previous clients in previous cases. Simply put, Plaintiffs argue that this is good advocacy, not unethical conduct.

*Analysis*

Defendant's argument rests inevitably on a self-serving reading of Plaintiffs' allegations. In the Complaint, Plaintiffs allege that Defendant has "failed to implement practice changes sufficient to comply with the TCPA." This allegation is capable of two interpretations: (1) Defendant has not sufficiently implemented the practice changes contemplated in the *Buchanan* settlement agreement, or (2) Defendant has implemented those changes, but they are nevertheless insufficient to establish an EBR, and thus insufficient to comply with the TCPA.

While Defendant proceeds on the assumption that that the second interpretation is correct, Plaintiffs urge that the first is correct, stating in their Response: "As Plaintiffs allege here, Sirius XM 'failed to implement' the promised practice changes" and "[Defendant] has never made any attempt to demonstrate that it implemented the promised practice changes."  Of course, as detailed in their second argument above, Plaintiffs also assert that "even if fully implemented," those practice changes "would not have immunized [Defendant]."

At this stage, the Complaint must be viewed in the light most favorable to Plaintiffs. *Williams v. Sheriff of Cook Cnty.*, 2017 WL 878731, at *4 (N.D. Ill. Mar. 6, 2017). The court therefore construes Plaintiffs' allegation that Defendant "failed to implement [sufficient] practice changes" as an allegation that Defendant failed to adequately implement those practice changes contemplated in the *Buchanan* settlement agreement. See also *Seybold v. Tazewell Cnty.*, 2022 WL 68385, at *7 (C.D. Ill. Jan. 6, 2022) (observing that "ambiguities in complaints in federal court should be interpreted in favor of plaintiffs, not defendants." (quoting *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992))). Based on this construction, Defendant's argument that counsel have an adequacy-defeating conflict must fail, and the Motion to Strike Class Allegations is denied on that basis.[2]

The court, therefore, does not consider the other arguments raised by Plaintiffs, namely, whether counsels' representations in *Buchanan* should be construed as stating that the proposed practice changes would fully insulate Defendant from TCPA liability on an EBR theory, or whether, if so, that would prevent the same counsel from ethically or legally pursuing the instant claims on behalf of the post-*Buchanan* class. The court notes that the extent to which Defendant implemented those practice changes is likely

---

[2] In their Response, Plaintiffs have cited to Defendant's current "Customer Agreement," — which, they assert, is "publicly available" on Defendant's website — in an effort to demonstrate that the specific changes outlined in the *Buchanan* settlement agreement have not, in fact, been fully implemented. The court presumes that Plaintiffs' reference to the public availability of that agreement is a tacit request for judicial notice. However, given that the matter at issue can be resolved purely on pleading standards, the court need not pull at that particular thread.

to be a central point of discovery, such that Defendant is free to renew its present argument in response to a potential motion for class certification. See *Meza v. Sirius XM Radio Inc.*, 2020 WL 905588, at *5 (S.D. Cal. Feb. 25, 2020) (observing that the same issue as that raised by Defendant here is "more appropriately . . . addressed in the context of a motion for class certification," after discovery has been conducted).

<u>Motion to Dismiss</u>

Defendant moves to dismiss Count III of the Complaint, which raises a claim under the Illinois Telephone Solicitations Act ("ITSA"), 825 Ill. Comp. Stat. 413 et seq. The ITSA requires a caller to "refrain from calling" any person who "requests to be taken off the [caller's] contact list." 815 Ill. Comp. Stat. 413/15. As Defendant points out, the ITSA makes clear that a private enforcement suit may be brought only by a "*customer* injured by a violation of this Act[.]" 815 Ill. Comp. Stat. 413/25(d) (emphasis added).

Defendant argues that Plaintiff Campbell—an Illinois citizen and the only Plaintiff bringing the ITSA claim—has pled herself out of court because "she specifically pleads that she is not one of [Defendant's] 'customer[s].'"

In support of its argument, Defendant relies extensively on *Freeman v. Quicken Loans, Inc.*, 2019 WL 13203215 (N.D. Ill. Feb. 26, 2019). In that case, the plaintiff received at least 14 phone calls from Defendant, soliciting his business to take out a loan. *Id.* at *1. The plaintiff informed the defendant after the first such call that he did not wish to receive further calls. *Id.* The plaintiff subsequently brought claims under the TCPA and the ITSA. *Id.*

In addressing the same argument that Defendant now raises, the district court observed:

> The question presented by the parties is what the Illinois General Assembly meant by 'customer' [in section 25(d) of the ITSA] and whether the General Assembly meant for <u>any</u> aggrieved person to have a private right of action or only persons who have had business dealings with the calling party prior to the placement of a call.

*Id*. at *3 (emphasis in original). Turning to the dictionary definition, the court defined customer as "one that purchases a commodity or service." *Id*. (quoting Merriam-Webster Online Dictionary, 2019, https://www.merriam-webster.com/dictionary/customer (Feb. 20, 2019)). The court thus noted: "The definition clearly does not mean one who is solicited without having ever made a purchase from the solicitor. Just because a seller reaches out to someone that may be a potential customer does not in fact make that someone a customer." *Id*. To find that the ITSA allowed *any* aggrieved individual to pursue a claim, the court reasoned, would render the term "customer" in the statute superfluous. *Id*. The court granted the defendant's motion to dismiss and the plaintiff leave to amend. *Id*. at *4.

Plaintiffs tacitly concede that, under the allegations set out in the Complaint, Campbell does not meet the definition of customer adopted by the *Freeman* court. However, they argue that other allegations in the Complaint as well as judicially noticeable materials from the *Buchanan* case and Defendant's "Customer Agreement" make clear that Defendant itself referred to individuals who, like Campbell, purchased a car and received a free trial of Sirius XM Radio, to be its customers. Plaintiffs conclude: "If [Defendant] considers the people it called to be customers (a position that

Plaintiffs do not necessarily endorse), it cannot now argue that those same people are not customers."

Plaintiffs have cited no case law in support of the notion that Defendant's internal and subjective characterizations of "customers" is in any way relevant to the analysis. The term "customer" in the ITSA must be given a legal construction based on the intent of the Illinois General Assembly, as the *Freeman* court endeavored to do, and this court fails to see how Defendant's own use of the term—in non-ITSA contexts—could have any impact on that construction. Surely Plaintiffs do not take the position that Defendant's choice to characterize them as "customers" simply makes them so. Plaintiffs' estoppel-adjacent argument must be rejected.

Plaintiffs next argue that "the *Freeman* interpretation of the term 'customer' is not per se the correct interpretation." This is no doubt true—this court is not bound by the decision of the *Freeman* court. But Plaintiffs have failed to even suggest an alternative construction of the term that Campbell might satisfy.

First, Plaintiffs cite curiously to the Illinois Trade Secrets Act, alleging that it "states that the term 'customer' may apply to 'actual or potential customers.'" But the cited section actually states that "Trade secret" means, inter alia, a "list of actual or potential customers." 765 Ill. Comp. Stat. 1065/2(d).[3] Insofar as this section has any

---

[3] Plaintiff refers to this section as "[a] separate section of the Illinois Telephone Solicitations Act addressing trade secrets[.]" But it is simply the Illinois Trade Secrets Act, an ITSA otherwise unrelated to the ITSA at issue in this case.

relevance to the current issue, it actually tends to demonstrate that "actual customers" are entirely distinct from "potential customers."

Next, Plaintiffs cite to *F.T.C. v. Pac. First Ben., LLC*, 472 F. Supp. 2d 981, 984 (N.D. Ill. 2007), in which the court defined "customer" to mean "any person who has paid, or may be required to pay, for goods or services offered for sale or sold by Defendants." Setting aside the fact that the ITSA was not at issue in that case, Plaintiffs do not explain how Campbell might have been "required to pay" for Defendant's product. For example, there is no allegation in the Complaint that Campbell could have been billed or charged automatically upon the expiration of her free trial.

When interpreting statutes, the court must first and foremost "give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006). To determine the plain meaning of a term not defined in the statute itself, courts regularly turn to the dictionary's definition. *United States v. Johnson*, 47 F.4th 535, 543 (7th Cir. 2022).

In *Freeman*, the court relied on Merriam-Webster in adopting the following definition for "customer" in the ITSA context: "one that purchases a commodity or service." *Freeman*, 2019 WL 13203215, at *3. Other dictionary entries for "customer" are substantially similar. *E.g.*, Oxford English Dictionary, 2019, https://www.oed.com/search/dictionary/?scope=Entries&q=%22customer%22 (Sept. 18, 2023) ("A purchaser of goods or services"); Black's Law Dictionary (11th ed. 2019) ("A buyer or purchaser of goods or services"). Accordingly, the court agrees with the

*Freeman* court; "customer" in section 25(d) of the ITSA should be construed as meaning "one that purchases a commodity or service."

As Plaintiffs do not dispute, the Complaint makes abundantly clear that Campbell, like the other Plaintiffs, did not purchase *anything* from Defendant. It follows that Campbell does not have standing to pursue an ITSA claim, and Count III of the Complaint must be dismissed. See *Freeman*, 2019 WL 13203215, at *4.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Strike Class Allegations (#6) is DENIED.

(2) Defendant's Motion to Dismiss (#6) is GRANTED. Count III of Plaintiffs' Complaint (#1) is DISMISSED.

(3) This matter is referred back to the magistrate judge for further proceedings.

ENTERED this 25th day of September , 2023.

s/Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE