**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| JULIE CAMPBELL, <br> DIANA BICKFORD and <br> KERRIE MULHOLLAND, on behalf of <br> themselves and all others similarly <br> situated, <br><br>         Plaintiffs, <br><br>         v. <br><br> SIRIUS XM RADIO LLC, <br><br>         Defendant. | Case No. 2:22-cv-02261-CSB-EIL |

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

1

# TABLE OF AUTHORITIES

Page

CASES

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)......................................................................7

*Arreola v. Godinez,*
546 F.3d 788 (7th Cir. 2008) ........................................................6

*Beaton v. SpeedyPC Software,*
907 F.3d 1018 (7th Cir. 2018) ......................................................7

*Bridgeview Health Care Ctr., Ltd. v. Clark,*
816 F.3d 935 (7th Cir. 2016) ........................................................1

*Brodsky v. HumanaDental Ins. Co.,*
910 F.3d 285 (7th Cir. 2018) ................................................14, 15

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
662 F.3d 913 (7th Cir. 2011) .....................................................1, 6

*FTC v. Day Pacer LLC,*
125 F.4th 791 (7th Cir. 2025) .....................................................16

*Gene & Gene LLC v. Biopay LLC,*
541 F.3d 318 (5th Cir. 2008) ........................................................6

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.,*
29 F.4th 839 (7th Cir. 2022) ............................................14, 15, 17

*Gunn v. Thrasher, Buschmann & Voelkel, P.C.,*
982 F.3d 1069 (7th Cir. 2020) ....................................................20

*Hand v. Beach Ent. KC, LLC,*
456 F. Supp. 3d 1099 (W.D. Mo. 2020) .......................................9

*Howard v. Cook Cnty. Sheriff's Off.,*
989 F.3d 587 (7th Cir. 2021) ........................................................6

*Howland v. First Am. Title Ins. Co.,*
672 F.3d 525 (7th Cir. 2012) ......................................................15

**Page**

*Jacks v. DirectSat USA, LLC,*
118 F.4th 888 (7th Cir. 2024) ...............................................................6

*Kleen Prods. LLC v. Int'l Paper Co.,*
831 F.3d 919 (7th Cir. 2016) ...............................................................20

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds,*
571 F.3d 672 (7th Cir. 2009) ...............................................................19

*McFields v. Dart,*
982 F.3d 511 (7th Cir. 2020) .................................................................7

*Mims v. Arrow Fin. Servs., LLC,*
565 U.S. 368 (2012)...............................................................................1

*Mullins v. Direct Digital, LLC,*
795 F.3d 654 (7th Cir. 2015) ...............................................................20

*Orr v. Shicker,*
953 F.3d 490 (7th Cir. 2020) .................................................................6

*Parchman v. SLM Corp.,*
896 F.3d 728 (6th Cir. 2018) .................................................................1

*Parko v. Shell Oil Co.,*
739 F.3d 1083 (7th Cir. 2014) ...............................................................7

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,*
863 F.3d 460 (6th Cir. 2017) .................................................................7

*Sapan v. Yelp, Inc.,*
2021 WL 5302908 (N.D. Cal. Nov. 15, 2021) ....................................12

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016)..............................................................................20

*Suchanek v. Sturm Foods, Inc.,*
764 F.3d 750 (7th Cir. 2014) .........................................................20, 21

*United States v. Dish Network L.L.C.,*
954 F.3d 970 (7th Cir. 2020) ...............................................................15

Page

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................................6

*Warciak v. Subway Rests., Inc.*,
    949 F.3d 354 (7th Cir. 2020) ......................................................................1

*Zelma v. Art Conway*,
    2013 WL 6498548 (D.N.J. Dec. 11, 2013) ...............................................9

**STATUTES**

47 U.S.C. § 227 .....................................................................................1, 16

N.C. Gen. Stat. § 75-101(5) ...........................................................................8

N.C. Gen. Stat. § 75-102(a) .......................................................................2, 5

N.C. Gen. Stat. § 75-103(a)(2) ......................................................................2

**RULES**

Rule 23(b)(3) ......................................................................................6, 20

Rule 23(c)(4) ..............................................................................................19

**REGULATIONS**

*In re Rules & Regs. Implementing the TCPA*,
    7 FCC Rcd. 8752 (1992) ...............................................................8, 9, 11, 13

*In re Rules & Regs. Implementing the TCPA*,
    18 FCC Rcd. 14,014 (2003) ..........................................................................8

16 C.F.R. § 310.2(q)(1) ...............................................................................16

47 C.F.R. § 64.1200(c) .............................................................................1, 8

47 C.F.R. § 64.1200(f) ..........................................................3, 9, 10, 11, 13, 18

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

    A.    Legal setting.......................................................................................... 2

    B.    Customers become acquainted with SiriusXM's radio services in many ways ........................................................................................... 4

    C.    The lawsuits ......................................................................................... 7

ARGUMENT ..................................................................................................... 7

    I.    The proposed class fails the predominance requirement ....................... 9

        A.    SiriusXM's EBR defense defeats predominance..................................... 10

            1.    SiriusXM's relationships with millions of proposed class members fall within the FCC's broad EBR definition. ............... 10

                a.    SiriusXM has formed EBRs with proposed class members on the basis of a "purchase or transaction." ...................................................................... 11

                b.    EBRs also exist on the basis of an "inquiry or application regarding products or services."................... 13

                c.    SiriusXM has formed EBRs with proposed class members as an "affiliated entit[y]." ................................. 14

            2.    The individualized inquiries into SiriusXM's relationships with each proposed class member defeats class certification. ............................................................................... 15

            3.    Plaintiffs' counterarguments are unconvincing. ........................... 17

        B.    Standing questions defeat predominance................................................. 21

    II.    The proposed class fails the superiority requirement .......................... 22

CONCLUSION.................................................................................................. 22

## INTRODUCTION

Times have changed. Initially, the Telephone Consumer Protection Act ("TCPA") "was viewed as a statute that could be enforced through small claims actions."[1] Now, it "has blossomed into a national cash cow for plaintiff's attorneys specializing in TCPA disputes." *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 941 (7th Cir. 2016). The result? Ever-increasing class litigation, fueled by repeat players and hefty lawyers' fees.[2]

But some things remain the same. Plaintiffs' counsel previously brought claims like these against SiriusXM with financial success due to the threat of classwide litigation. They seek a repeat, with three new plaintiffs to set up a new class action (and, they hope, settlement). Each plaintiff claims that SiriusXM illegally called to renew her subscription, seeking $500 to $1,500 per call. Those particulars are beside the point. Class certification multiplies the potential damages astronomically, which "puts a bet-your-company decision to [defendants] and may induce a substantial settlement even if the customers' position is weak." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 915 (7th Cir. 2011). ██████████████ ████████████████████████████████████

To be sure, as the Seventh Circuit has noted (with resignation), the TCPA "is what it is." *Id.* But its "draconian" penalty puts a fine point on this Court's duty to undertake a "*rigorous analysis*" to ensure that the class-action prerequisites are satisfied. *Id.* at 915-16. Those prerequisites make especial sense here. Before pressuring a defendant with exponential damages across millions of plaintiffs, a court should confirm that common questions *actually* predominate,

---

[1] Snell & Mino, *Telephone Consumer Protection Act Cases Are on the Rise*, Bloomberg L. (Feb. 11, 2013), https://news.bloomberglaw.com/tech-and-telecom-law/telephone-consumer-protection-act-cases-are-on-the-rise.

[2] Pardau, *Good Intentions and the Road to Regulatory Hell: How the TCPA Went from Consumer Protection Statute to Litigation Nightmare*, 2018 U. Ill. J.L. Tech. & Pol'y 313, 321-23.

and that the case will not collapse into a member-by-member analysis. And before certifying, a court should verify that merging millions of individual cases is actually the best method, and that it would not make more sense for anyone who truly feels aggrieved to bring an individual claim.

This case falls far short. The TCPA protects individual recipients from uninvited calls—a necessarily fact-intensive claim. The FCC's regulations grant SiriusXM a defense: so long as it has an existing business relationship ("EBR") with a recipient, it will not be liable for calling her regardless of her presence on the national Do-Not-Call Registry ("Registry"). The regulatory text and the FCC's corresponding rules confirm this inquiry is very individualized; it cannot be answered automatically for this million-member class. Evaluating each individual's claim will require millions of mini-trials over each's relationship with SiriusXM: what they saw, heard, and asked before acquiring a vehicle equipped with a SiriusXM radio and subscription, and even what they said during millions of phone calls with SiriusXM's call-center vendors.

Nor have Plaintiffs shown that a class action is the superior device for bringing these claims. The TCPA's drafters contemplated that individual plaintiffs would file suit in small-claims court, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 384 (2012), and the statute's generous rewards fully incentivize reasonable claimants. Here, the relatively few (out of millions) subscribers who felt aggrieved *have* filed individual claims. Allowing a class action—when it will inevitably turn into countless individual disputes *anyway*—benefits no one but the lawyers.

## **BACKGROUND**

### A.    **Legal setting.**

"Congress passed the TCPA in order to protect consumers by regulating telemarketing communications." *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020). It does so by prohibiting certain advertising practices via fax or telephone. The statute itself generally prohibits faxing "unsolicited advertisements" and making robocalls. 47 U.S.C. § 227(b). And it

directs the FCC to "prescribe regulations to implement" its policy of "protect[ing] residential telephone subscribers' privacy rights." § 227(c)(1)-(2). The FCC then promulgated 47 C.F.R. § 64.1200(c)(2), which provides that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the [Registry]."

The TCPA allows any "person who has received more than one" telemarketing phone call "within any 12-month period" in violation of the FCC's regulations to bring suit. § 227(c)(5). But "what motivates TCPA suits is not simply the fact that an unrequested ad arrive[s] on a fax machine," *Bridgeview Health Care Ctr.*, 816 F.3d at 941, or that an unwelcome call disturbs someone's peace. It is instead the $500 in statutory damages per violation, which can be trebled for a willful or knowing violation. *Id.*; § 227(c)(5).

The TCPA's "primary purpose" was "to protect *individuals* from the harassment, invasion of privacy, inconvenience, nuisance, and other harms associated" with unsolicited telemarketing. *Parchman v. SLM Corp.*, 896 F.3d 728, 738 (6th Cir. 2018) (emphasis added). True to that purpose, it provides defenses specific to the individual. Liability is premised on "telephone solicitation[s]," 47 C.F.R. § 64.1200(c)(2), a term defined to exclude calls "[t]o any person with whom the caller has an [EBR]." § 64.1200(f)(15); § 227(a)(4)(B). The regulations define an EBR as:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call[.]

§ 64.1200(f)(5).

North Carolina Telemarketing Law § 75-102(a) ("NCTL") tracks the TCPA. It prohibits any "telephone solicitor" from making "a telephone solicitation" to a number in the Registry. It does not apply to "telephone solicitations that are made" to "any telephone subscriber with whom the telephone solicitor has an [EBR]." N.C. Gen. Stat. § 75-103(a)(2). And it similarly defines an EBR to include a seller-consumer relationship based on "[t]he consumer's inquiry or application regarding a product or service offered by the seller." *Id.* § 75-101.

**B.      Customers become acquainted with SiriusXM's radio services in many ways.**

SiriusXM, one of the nation's largest satellite and internet-based audio entertainment companies, provides services to over 32 million subscribers. A.3. Most subscribers use these services in their vehicles. *See* A.3. And most vehicles come with SiriusXM satellite radios preinstalled and trial subscriptions of varying lengths. A.1674.

Those numbers start from business relationships between SiriusXM and every major vehicle manufacturer ("OEM"). Through contracts with SiriusXM, OEMs preinstall in their vehicles SiriusXM radios purchased from third parties, pre-activate trial subscriptions before delivery to dealers, feature the service as a vehicle component, describe it in their owner manuals, and help SiriusXM market the service as a selling point to vehicle shoppers in scores of ways. A.1674-75, 1677-81. For example, OEMs list SiriusXM as a feature on the federally-mandated Monroney label. A.1675. They also place SiriusXM's informational, sales, and marketing materials in their vehicles. A.1677. These materials tell customers that the vehicle includes a trial subscription, guarantee comprehensive customer service, provide information about renewing that subscription, inform customers about how to contact SiriusXM, and explain that SiriusXM "may ... contact [them] by mail, phone or email to discuss subscription options." A.1679. OEMs even receive financial rewards for customer conversions to paid subscriptions, further motivating them to make customers aware of SiriusXM. A.1675.

Customers have numerous other opportunities to be introduced to SiriusXM's radio service. Start at the point of sale. SiriusXM has business relationships with thousands of auto dealers. A.1681. SiriusXM and OEMs frequently train dealers about marketing the service to their customers. That training instructs salespeople to, among other things, provide in-vehicle demonstrations and a brochure with channel guide and explain that SiriusXM will contact them to discuss subscription options. A.1685-86. To reinforce the relationship, dealerships often play SiriusXM stations. A.1682.

These practices pay dividends. Dealers regularly advertise SiriusXM's radio services as part of the purchase. A.3634 ("always show[s] [a] customer [interested in a vehicle] the SiriusXM mini brochure from the glove box"); A.3691 ("explain[s] that customers will receive in the vehicle purchase or lease a trial of [SiriusXM's] radio service"); A.3657 (similar). Also, dealers often explain to customers that they can expect future interactions with SiriusXM. A.3672 ("instruct[s] [his] sales representatives to tell customers that they will receive a call from [SiriusXM] asking whether the customer wishes to renew their subscription after their trial is over"); A.3681 (similar); A.3688 (similar). Customers are frequently receptive, and occasionally "ask for pricing information for [SiriusXM's] paid subscription packages." A.3681; A.3657 (confirming that, after telling customers that "a SiriusXM representative will contact them directly," "no customer … has ever told me that they did not want to receive a call"); A.3681 (similar).

Critically, each vehicle transaction—and accompanying promotion of SiriusXM services—is individualized. The circumstances involving each named plaintiff confirm this point. Mulholland testified that she "remember[ed]" the salesperson "telling [her] specifically that the car came with a free trial of Sirius XM." A.3330. Campbell testified that, when buying her Lincoln MKZ, "the salesman … may have … told [her] that it had Sirius XM Radio." A.3250. Bickford

claims that her salespeople never told her about SiriusXM, but she was "sure that[ it is] possible" that "in some cases the dealer *would* tell the car buyer about the free trial." A.3417-18 (emphasis added).

After the vehicle transaction, customers continue to interact with SiriusXM. It sends subscribers a Welcome E-mail and mails them a Welcome Kit. A.4. These materials reinforce what customers have already learned about SiriusXM's services and their subscriptions' benefits. For instance, Welcome Kits are frequently co-branded on behalf of SiriusXM and the OEM, stressing that the subscriptions are a part of the vehicle acquired. A.5. And these materials again contain information on managing communication preferences and contacting SiriusXM. A.4. At times, this outreach is unnecessary: customers often contact SiriusXM to convert to a paid subscription even *before* SiriusXM receives their information—a happenstance SiriusXM aptly terms "beat the sold record." A.4.

Customers also engage with SiriusXM via telephone. For example, sometimes customers call SiriusXM to refresh the radio signal. A.1688. Other times—just as dealership personnel explained would happen—independent vendors contact them on SiriusXM's behalf. A.7-8. Those vendors are trained by SiriusXM on "sales strategy," "products," and "system use," and are instructed "to honor every do not call request." A.3584-86.

Typically, vendor representatives tell customers they are calling on behalf of SiriusXM, congratulate them on their recent acquisition, and ask how they are enjoying their subscription. A.8. From there, the conversations are highly individualized. Sometimes customers welcome the call, inquire about SiriusXM's subscription plans, and ask how to sign up for a paid subscription. A.9-10. Other times, customers tell representatives that they need more time to decide whether they want to purchase a subscription. A.10-12. Still other times, customers explain that they are

not interested in purchasing a subscription at the moment, but ask for or agree to receive a call back from SiriusXM. A.8-9. And customers sometimes request during those calls that SiriusXM not contact them anymore. A.13.

With all these interactions, it is no surprise that millions of drivers use SiriusXM services. Up to 80% of trial subscribers listen to their SiriusXM radios, and a large share soon convert to paid subscriptions. A.15-16.

### C. The lawsuits.

In 2017, these same Plaintiffs' counsel brought a TCPA lawsuit in the Northern District of Texas styled *Buchanan v. Sirius XM Radio, Inc.* A.3206. Those allegations mirrored the ones here: SiriusXM called people on the Registry "without there being an [EBR] with the Plaintiff or [class members]." A.3217. The case settled.

Three years later, counsel sued again with new plaintiffs, alleging violations of the TCPA and N.C. Gen. Stat. § 75-102(a). Each plaintiff had purchased a vehicle. A.3709, 3712-13. Each alleged that SiriusXM placed telemarketing calls to them without "an EBR with Sirius XM." A.3710, 3713-14. Two—Bickford and Mulholland—claimed they were on the Registry. A.3712, 3714.

Plaintiffs move to certify a class of all persons who: "(1) received more than one SiriusXM telephone solicitation call on their residential phone number (2) in any 12-month period telemarketing during the Class Period (3) 31 or more days after registering their telephone number with the DNC Registry, and (4) did not purchase SiriusXM's satellite radio service." Mot. 9. They define three subclasses, including one for North Carolina residents. Mot. 9 n.4.

### ARGUMENT

"A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Jacks v. DirectSat USA, LLC*, 118 F.4th

888, 895 (7th Cir. 2024). For good reason. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (cleaned up). And "a decision regarding certification can have a considerable impact on the playing field of litigation." *Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020) (cleaned up). "Certification as a class action can coerce the defendant into settling on highly disadvantageous terms, regardless of the merits," given "the magnitude of the potential damages." *Creative Montessori*, 662 F.3d at 915 (cleaned up). Especially here, given the TCPA's "very heavy" potential penalties. *Id.* at 915-16.

Because Plaintiffs seek to certify a Rule 23(b)(3) class, this Court must "find that common questions of law or fact 'predominate' over individual ones and that a class action is 'superior' to other methods of adjudicating the case." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021). It is Plaintiffs' burden to meet these requirements, even where the issue that threatens predominance is an affirmative defense. *See, e.g.*, *Gene & Gene LLC v. Biopay LLC*, 541 F.3d 318, 329 (5th Cir. 2008). Failure to satisfy either precludes certification. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

Plaintiffs fail on numerous fronts. Common questions of law or fact emphatically do *not* predominate. This suit will descend into a series of mini-trials regarding what each class member heard and saw about SiriusXM before visiting the dealership, what transpired at the dealership, and what was later said in each phone conversation with SiriusXM's vendors. For similar reasons, a class action is not superior to individual trials; no reason exists to give Plaintiffs' counsel a (second) windfall when individual plaintiffs are fully capable of and incentivized to bring their own suits, as those who truly felt aggrieved have done.

8

## I.    The proposed class fails the predominance requirement.

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). It is a "far more demanding" test "than the commonality requirement." *McFields v. Dart*, 982 F.3d 511, 519 (7th Cir. 2020). The predominance inquiry "compares the quality of the common questions to those of the noncommon questions." Newberg and Rubenstein on Class Actions § 3:27. That comparison "requires more than a tally of common questions; the district court must consider their relative importance." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1029 (7th Cir. 2018).

This inquiry "goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). "If resolving a common issue will not greatly simplify the litigation to judgment or settlement of claims of hundreds or thousands of claimants, the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring." *Id.* Accordingly, "the key is to identify the substantive issues that will control the outcome"—to ask "how a trial on the merits would be conducted if a class were certified." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (cleaned up).

Individual issues predominate here. The TCPA applies only to "telephone solicitations," expressly defined to exclude "a call ... [t]o any person with whom the caller has an [EBR]." 47 C.F.R. § 64.1200(c), (f)(15). Determining which class members had an EBR will definitionally require individualized inquiries, thousands if not millions of times over. The same goes for determining which class members were even *injured* by an unrequested phone call. Plaintiffs do not come close to meeting their predominance burden.

## A. SiriusXM's EBR defense defeats predominance.

EBRs form from "transaction[s]," "inquir[ies]," and "application[s] regarding products or services offered by" SiriusXM, "with or without an exchange of consideration." § 64.1200(f)(5); N.C. Gen. Stat. § 75-101(5) (similar). As explained below, EBR raises a textbook example of individualized issues that will predominate in any merits trial. Nor is there any shortcut to deciding the merits of this defense. Instead, it requires individualized analysis—and, in a proposed class this large, millions of mini-trials.

### 1. SiriusXM's relationships with millions of proposed class members fall within the FCC's broad EBR definition.

An EBR can be formed in two ways: (1) on the basis of "the subscriber's purchase or transaction with the entity," or (2) on the basis of "the subscriber's inquiry or application regarding products or services offered by the entity." § 64.1200(f)(5). As the FCC has repeatedly recognized, these categories are "broad" by definition, and "encompass a wide range of business relationships." *In re Rules & Regs. Implementing the TCPA*, 7 FCC Rcd. 8752, 8771 (1992). Under that umbrella fall obvious EBRs like "publishers with subscribers" and "credit agreements," *id.*, as do companies looking to "'winback' or 'renew' [a] customer's business"—for instance, where a consumer once had "a subscription with a particular newspaper," such a consumer could obviously "expect to receive a call." *In re Rules & Regs. Implementing the TCPA*, 18 FCC Rcd. 14,014, 14,080 (2003).

As that breadth indicates, the EBR defense is important in much TCPA litigation; assessing it is largely how these cases proceed. *E.g.*, *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1119, 1121-23 (W.D. Mo. 2020). That is exactly what will happen here. SiriusXM does not find its customers through autodialing or mass-faxing. It conducts its business at the personal level, taking pains to form relationships with OEMs, dealers, salespeople, and customers. SiriusXM's subscriber base is the result of millions of individual interactions between SiriusXM and

customers—starting at the factory with OEMs, continuing through the point of sale at dealerships, and culminating with post-transaction communications with customers (including individual calls both to and from SiriusXM). Based on these and other interactions, SiriusXM will present evidence showing that it had EBRs with many proposed class members.

      **a.    SiriusXM has formed EBRs with proposed class members on the basis of a "purchase or transaction."**

An EBR can arise "on the basis of the subscriber's purchase or transaction with the entity," "with or without an exchange of consideration." § 64.1200(f)(5). The obvious example would be a direct purchase from the entity, but that is not necessary. Agency principles apply: for instance, third-party "telemarketers may rely on the seller's EBR to call an individual consumer to market the seller's services and products." *In re Rules*, 18 FCC Rcd. at 14,083.

Critically for class purposes, substance, not form, controls that analysis. As the FCC puts it, "if a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller" as well as the retailer. *Id.* at 14,083 n.382. It is of "no consequence" that the consumer might not have paid the seller *directly*; there still exists a "transaction" sufficient "to trigger the [EBR] exception." *Zelma v. Art Conway*, 2013 WL 6498548, at *2 (D.N.J. Dec. 11, 2013).

Under these principles, most—if not all—proposed class members have EBRs with SiriusXM. *Every* proposed class member completed a "purchase or transaction" when they acquired a vehicle with a bundled SiriusXM radio and subscription. Per contracts with SiriusXM, OEMs pre-install SiriusXM radios and include trial subscriptions with their vehicles. A.1673-75. Those radios and subscriptions are not secret. SiriusXM service is marketed to customers in different ways as a vehicle feature at the point of sale. A.1675-78, 1680-81. Vehicles come with brochures about SiriusXM, and the Monroney label on every new vehicle identifies the SiriusXM

radio subscription. A.1677, 1680. Salespeople highlight SiriusXM's service to customers; indeed, one plaintiff admits that the salesperson explained that the vehicle she was considering included a subscription, A.3330, while another testified that SiriusXM appeared on the vehicle's computer screen as soon it started, A.3249-50. Customers often focus on vehicle models that include a subscription, eschewing ones that do not. A.3680 ("Customers often have asked me if a vehicle is equipped with Sirius XM"); A.3697 (similar); A.3691-92 (Dealer "had customers who paid for the high cost package [on a truck] just to get Sirius XM[]'s service," and "other customers … declined to purchase that truck model because it did not come with Sirius XM's radio service as a standard feature"). And multiple surveys over the years confirm that customers consider SiriusXM's service as among the top features they evaluate in a vehicle purchase. A.1676. In short, significant evidence shows that customers realized they were subscribing to SiriusXM when they acquired their vehicles and so have EBRs. If Plaintiffs challenge that point, the Court at a minimum will need to evaluate whether individual customers understood (or reasonably should have understood) that their vehicle included a SiriusXM subscription or expressly asked for a vehicle with this service, confirming a "transaction" under the FCC's regulations.

The same follows if viewed through agency principles. SiriusXM has arrangements with all major OEMs and thousands of dealerships, and those arrangements require the dealerships (and their salespeople) to promote SiriusXM's services to customers at the point of sale. A.1680-81. These interactions illustrate two points. First, SiriusXM may not literally own a dealership, but it in every real sense "transact[s]" with purchasers of vehicles equipped with a SiriusXM radio. Indeed, SiriusXM's dealer agreements specifically provide that dealers are SiriusXM's "agent[s]" for purposes of marketing the service to customers. A.1681. Second, SiriusXM's relationships with dealers vary. Depending on dealers' size and market importance, SiriusXM will visit some

more often, reinforcing more frequently in those dealers the importance of marketing SiriusXM's service to customers in their showrooms.  A.1684.  Whether an EBR arises in any individual instance will require—unsurprisingly—an individual inquiry into every interaction that every customer had at every dealership.

> **b.**   **EBRs also exist on the basis of an "inquiry or application regarding products or services."**

SiriusXM does not need to prove a "purchase or transaction" for there to be an EBR with proposed class members.  An EBR can also arise from "an inquiry or application regarding [SiriusXM's service]."  § 64.1200(f)(5).  The FCC has rejected the notion that an EBR "only include[s] situations where a purchase or transaction is completed."  *In re Rules*, 18 FCC Rcd. at 14,080.  Rather, an inquiry standing alone suffices, so long as it "create[s] an expectation on the part of the consumer that a particular company will call them."  *Id.* at 14,080-81.  This question too is fact-intensive.  "[A]n inquiry regarding a business's hours or location would not establish the necessary relationship," but a consumer "making an inquiry ... regarding a company's products or services" may "reasonably expect a prompt follow-up telephone call."  *Id.* at 14,081.

SiriusXM expects to show that it has an EBR with proposed class members through this category, too.  Start with SiriusXM's communications with class members.  SiriusXM sends customers a Welcome Kit and emails that reinforce the OEMs' and many dealerships' messaging about its service, and signal to customers that they should expect a call from SiriusXM.  A.4-5.  Customers are then called by live representative—in other words, every one of those millions of calls is unique.  *Sapan v. Yelp, Inc.*, 2021 WL 5302908, at *5-6 (N.D. Cal. Nov. 15, 2021) (denying class certification after Yelp showed that it had to "analyze the content of [the named plaintiff's] comments to determine whether any created an established business relationship" and that "it would need to do [this] for each putative class member").

That is true here, too. There are innumerable recordings of calls to trial subscribers, which yield a vast trove of information requiring call-by-call review. At trial, it will be necessary to evaluate each call to see what the vendor's representative told the customer and whether the customer expressed interest in the service or a paid subscription during the call. This is not hypothetical: the record (including portions Plaintiffs submitted with their motion) shows this was often the case. Customers ask representatives about the service's features (such as which plan "offers [them] those channels," and whether they can "talk to [their] car radio with [their] phone with the Sirius connected"), SiriusXM's promotions (such as "the best deal you've got going now," and whether a plan comes with "Walmart delivery for free for 12 months"), or the pricing (such as the price "if [they] wanted to do on a month-to-month basis")—and for a chance to consider SiriusXM's offer. A.980, 982-83, 1010, 1136. Or they express interest in the service (*e.g.*, saying they "[s]ure have" been enjoying the service, or find it "pretty cool because [they] could listen to whatever [they] wanted to"), but ask for a call back at a different time. A1661, 11670. Even the recording excerpts submitted by Plaintiffs yield numerous customers asking for calls back. A.12.

And this inquiry ignores critical conversations at dealerships. Again, the TCPA incorporates agency principles. Dealerships and their salespeople are under exhaustive instructions from SiriusXM on how to promote its service and therefore serve as its agents. By bringing up SiriusXM on their own at the dealership, or responding favorably to a salesperson's SiriusXM-directed pitch, customers also make an "inquiry or application" regarding SiriusXM's services. A.3682, 3697. There, too, customers should reasonably expect SiriusXM to follow up.

### c. SiriusXM has formed EBRs with proposed class members as an "affiliated entit[y]."

SiriusXM would even have an EBR as an "affiliated entit[y]" of the dealerships. When an EBR is found between a customer and a company, its protections extend to entities "affiliated"

with that company, so long as the customer "would reasonably expect" the affiliated entity "to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate." § 64.1200(f)(5)(ii). This extension of the EBR "is based on consumers' reasonable expectations of which companies will call them." *In re Rules*, 18 FCC Rcd. at 14,083. That then usually depends on whether the customer recognizes the company. As the FCC noted, "consumers often welcome calls from businesses they know," but "likely" would be "surprise[d]" by calls from businesses they "do[] not recognize by name." *Id.*

Again, this on its face is a fact-intensive, customer-by-customer inquiry. Proposed class members indisputably have an EBR with the dealership from which they acquired their vehicles. Plaintiffs cannot plausibly suggest that all those customers' reasonable expectations—which depend on their varying introductions to SiriusXM at the dealership—can be decided in one fell swoop. Indeed, the record demonstrates the variety of conversations that took place at thousands of dealerships. Some made clear that SiriusXM's services were a central part of the dealership's offerings. A.3671, 3691-92. Others described SiriusXM's services as one of many that came with the vehicle. A.3688. SiriusXM is a widely known consumer brand and has been factory-installed in vehicles for over twenty years. A.1674. If anything, there is a good case to be made that *every* proposed class member would reasonably expect that SiriusXM service came with a vehicle. Should Plaintiffs resist that argument, however, there is no way to determine whom SiriusXM has an EBR with on a classwide basis.

### 2. The individualized inquiries into SiriusXM's relationships with each proposed class member defeats class certification.

The Seventh Circuit recognizes that defenses like these often defeat class certification. Start with *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839 (7th Cir. 2022), where the plaintiff sought to bring a class action based on receiving unsolicited advertisements via fax, a

claim to which the TCPA provides a defense of "prior express invitation or permission," § 227(a)(5), which like EBR can be intensely individualized. The Seventh Circuit affirmed the denial of class certification. 29 F.4th at 841. For recovery, the "key issue to be resolved" was "whether the fax advertisement was sent without prior express permission." *Id.* at 844. That question was an individual one, because "there [was] no generalized proof"—such as standardized "forms" or "agreements"—to "resolve" it. *Id.* at 844-45. Importantly, it *did not matter* that the defendant "failed to prove that any single recipient consented"; "it is the method of determining the answer and not the answer itself that drives the predominance consideration." *Id.* at 845.

*Brodsky v. HumanaDental Ins. Co.*, 910 F.3d 285 (7th Cir. 2018), another junk-fax case, ended with the Seventh Circuit affirming a denial of class certification for roughly the same reasons. The court noted that "the legality of the defendants' actions may end up depending on whether the fax was sent with permission." *Id.* at 291. Because "[t]he question of what suffices for consent is central," it was "necessary to distinguish between faxes sent with permission of the recipient and those that are truly unsolicited." *Id.* That determination was "likely to vary from recipient to recipient." *Id.* It did not matter whether the named plaintiff consented himself; the court "d[id] not know what kind of pre-existing arrangement may have existed between [the defendant] and the other fax recipients that [the plaintiff] wants to represent." *Id.* The defense, in short, bore "the hallmarks of an issue that requires individual scrutiny." *Id.*

This case is no different from *Gorss Motels* and *Brodsky*. Whether SiriusXM has an EBR is "[a]n individual question" where "members of [the] proposed class will need to present evidence that varies from member to member." *Gorss Motels*, 29 F.4th at 843-44. "[N]o generalized proof" will resolve that issue, *id.* at 845; an EBR's existence will depend on the content of every conversation a putative class member had at the dealership or over the phone, as well as an

16

examination of the SiriusXM materials viewed by each customer during their dealership visit and vehicle purchase. *Id.*; *see also Howland v. First Am. Title Ins. Co.*, 672 F.3d 525, 532 (7th Cir. 2012) (the "transaction-specific inquiry prevent[ed] class treatment"). Turning this into a class action would not help putative class members—who would face the same kinds of evidence they would face in individual suits—and certainly would not help this Court. All *it* would have to look forward to is the "specter of unlimited mini-trials," *Gorss Motels*, 29 F.4th at 842, the very prospect that defeats certification.

### 3.    Plaintiffs' counterarguments are unconvincing.

Plaintiffs say surprisingly little to dispute any of this. Instead, they labor under the notion that an EBR depends on "the consumer's purchase, rental, or lease of the seller's goods or services." Mot. 17 (quoting *United States v. Dish Network L.L.C.*, 954 F.3d 970, 979 (7th Cir. 2020)). And because Plaintiffs define the proposed class to include only customers who "did not purchase SiriusXM's satellite radio service," Mot. 9, they think they are in the clear.

That is Plaintiffs' only substantive argument on the EBR defense.[3] To begin, Plaintiffs' counsel cannot advance it. They *got paid* in *Buchanan* because SiriusXM agreed to change its practices in ways counsel *admitted* strengthened SiriusXM's EBR defense but have nothing to do with purchasing subscriptions. *See* A.3743-44, 3841-42. Plaintiffs' argument is also easily rebutted by the operative text. As mentioned repeatedly, the FCC defines an EBR to include relationships formed "on the basis of [an] inquiry," "application," or "transaction," "with or

---

[3] Plaintiffs' primary response is that SiriusXM has not raised this defense, Mot. 16, but Plaintiffs preemptively addressed the supposed absence of EBRs in their Complaint. ECF 1, ¶¶ 36-38, 43, 54, 62, 70, 80. In addition, SiriusXM's motion for leave to raise it (and others) remains pending. ECF 63. Plaintiffs also suggest this legal issue has already been resolved, citing several state investigations. Mot. 18. But none has resolved the EBR arguments raised here. A.21.

without an exchange of consideration." § 64.1200(f)(5). No purchase is necessary. It is that straightforward.[4]

How do Plaintiffs go so wrong? In at least two ways. *First*, Plaintiffs' rule statement quotes from 16 C.F.R. § 310.2(q)(1). That is the wrong regulation. Plaintiffs' claims apply only to "violation[s] of the regulations prescribed under" 47 U.S.C. § 227(c). The Federal Trade Commission, by contrast, promulgated § 310.2 under the Telemarketing and Consumer Fraud and Abuse Prevention Act. *FTC v. Day Pacer LLC*, 125 F.4th 791, 799 (7th Cir. 2025).

*Second*, even if this Court pretended that § 310.2 were the relevant regulation, Plaintiffs quote from it misleadingly. Yes, § 310.2 defines an EBR as a relationship based on a "purchase, rental, or lease of the seller's goods or services or a financial transaction" in subsection (q)(1). But in *subsection (q)(2)*, the regulation *also* says that an EBR includes a relationship based on "[t]he person's inquiry or application regarding a good or service." Again, no purchase is required.

Relying on their purchase-only misconception, Plaintiffs contend that they can defeat the EBR defense on a classwide basis ██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ But by doing so Plaintiffs betray another misunderstanding—one of their own "expert's" report. ████████ ████████████████████████████████████████████████████████████████ Instead, using an unrecognized methodology, he haphazardly excluded a customer's phone number from his count if (among other things) the records classified any call to the customer in a host of ways, some of which he admittedly did not understand. A.3467-68, 3477-78, 3483, 3486-90, 3495.

---

[4] Additionally, as explained above, *see supra* at 11-13, SiriusXM would have an EBR with proposed class members even if a purchase or transaction were required.

Ironically, he did so because—operating under a broader conception of what counted as an EBR than Plaintiffs'—he thought he could identify who had not purchased a subscription *and* who had not made "any inquiry about paid service." Ex. 20 ¶ 2.

He was wrong. Not only did he fail to identify all customers who paid for a SiriusXM subscription, A.3492, but his efforts also establish that inquiries cannot be eliminated through any "method" of "generalized proof"—let alone his, *Gorss Motels*, 24 F.4th at 844-45. To identify EBRs, including inquiries, Woolfson considered outgoing call records from SiriusXM regarding each call. A.3467. But those records do not eliminate the need for call-by-call review. Woolfson thought he could use the call's "disposition" to make precise "in" or "out" conclusions. A.3473, 3478. But these "dispositions" are imprecise; they are simply codes that roughly capture the caller's "perception of what happened during a particular call to a customer." A.21. Not the elements of an EBR, and certainly not what is required for litigation.

That makes sense. SiriusXM cannot distill into finite codes the myriad ways customers might inquire about its services, nor how individual representatives might perceive those inquiries over millions of calls. Consider one prominent example involving a named plaintiff. Campbell's answering machine contained an outgoing message where her son pretended to answer and perhaps invite a call, "maybe tomorrow." She admitted that the message could bear varying interpretations—including an invitation to call back. A.3275. Ultimately, the flow and context of each call is critical, and assessing that is a quintessential individualized issue.

Reviewing the call recordings confirms this point. Representatives may use a centralized dialer, along with standard scripts and disposition codes, as Plaintiffs assert, Mot. 6, but customers' responses vary and so do how they are reflected in the records. Consider a handful of the calls mentioned earlier: one customer might ask a representative for "the best deal" but agree to a call

back because she "ha[d] to find out first if [her son] wants it"; another might inquire about the "month-to-month" price but ask for "a call[ ]back tomorrow" so that he could "talk to [his] wife"; still another might find the service "pretty cool" but ask for a call back to avoid "giv[ing] [her] information … over the phone" in public. A.1010-11, 1136, 1170-71. For each call, though, the "disposition" in the records is simply "Customer unavailable, lead should be recycled." A.1667-68. By reviewing call records alone, Woolfson did not—and could not—isolate those calls as inquiries. Indeed, an incomplete survey of just three months of recordings found over 60 calls with that disposition where the customer asked for a call back or expressed interest, as well as 20 similar calls logged with different dispositions. A.9, 22-23.

Woolfson's attempt at a classwide assessment suffers other flaws. To start, the call records omit (obviously) customers' conversations at dealerships. And even within those records Woolfson found just three of the "[a]t least 40 calls" Mulholland says she received. A.3356, 3497-99. Perhaps the problem is with the records, his methodology,[5] or even Mulholland's testimony. Yet from a bird's-eye view, these flaws together reveal that the only way to determine whether an EBR formed between SiriusXM and any particular class member will be to review testimony about the contents of that class member's communications with SiriusXM.

In short, Woolfson's work, if anything, *proves* that this case cannot be resolved in a class action. Perhaps that is why Plaintiffs abandoned his approach and instead resorted to a misleading

---

[5] Such flaws are legion. For instance, Woolfson's method of identifying North Carolina residents does not even capture the supposed subclass representative because he looked solely at area code, A.3504, even though she (like many of us) still uses a number that reflects her prior residence in a different state, A.3327-28. ████████████████

incomplete quote from the wrong regulation. That this is the best they can do confirms this class cannot be certified.[6]

## B. Standing questions defeat predominance.

Plaintiffs' proposed class also runs into standing problems that foreclose certification. A proposed class is "too broad" if "it sweeps within it[s definition] persons who could not have been injured by the defendant's conduct." *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672, 677 (7th Cir. 2009). "[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Id.*

Plaintiffs have defined their proposed class so broadly that it necessarily includes many consumers who never heard or noticed SiriusXM's phone calls. Mot. 9; ███████████████

██████████████████████████████████████████████████████

██████████ ; A.8. Congress cannot create Article III injuries from mere airwaves, *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016), and SiriusXM cannot be liable for trees that fall in the forest with no one around, *see Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069, 1071 (7th Cir. 2020) (calls "can cause cognizable injury," based on "how the common law treats noises and other aggravating intrusions"). Plaintiffs cannot correct this error since determining which calls fell to the ground unnoticed (since experience confirms that many consumers do not notice calls that connect to voicemail) can be determined only on a member-by-member basis. A.8. For this reason too, individual issues predominate.

---

[6] Plaintiffs briefly "request … Rule 23(c)(4) certification … to seek classwide declaratory relief finding SiriusXM liable." Mot. 20. Determining SiriusXM's liability necessarily involves its EBR defense and so raises all the problems addressed above.

## II.     The proposed class fails the superiority requirement.

Rule 23(b)(3) requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." This requirement is "comparative," and a court must juxtapose "the administrative costs and headaches of proceeding as a class action" with "other available methods." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015). For instance, a court might find the class-action device superior when a case has only a "smattering" of individualized issues. *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016) (superiority satisfied when less than 0.2% of class members were affected by "individual contract defenses"). For another, class actions may be superior when "no rational individual plaintiff would be willing to bear the costs of th[e] lawsuit." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014).

Neither is true here. Individual issues predominate, and it is hard to conceive what efficiencies are gained by certifying a class action when the trial will inevitably break into millions of mini-trials on SiriusXM's defenses. For similar reasons, no reason exists to prefer the class-action device to the most obvious alternative—individual suits by individual plaintiffs. If Plaintiffs are right that SiriusXM has repeatedly called members of the class, at a penalty of $500 to $1,500 per call, a "rational individual plaintiff" would easily be "willing to bear the costs of [a] lawsuit" for that payout. *Id.* The evidence is telling: over 60 individual plaintiffs (including at least one represented by one of the class counsel here) have done so. A.17-20. Rather than certify the class, or the corresponding North Carolina subclass, the Court should choose the more efficient path of allowing individuals to similarly decide for themselves whether the calls they received give them claims worth pursuing.

## <u>CONCLUSION</u>

The Court should deny the motion for class certification.

Dated: February 26, 2025

Respectfully submitted,

*/s/ Lee A. Armstrong*

JONES DAY

Christopher A. Hall
IL #6316715
chall@jonesday.com
110 North Wacker Drive
Suite 4800
Chicago, IL 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

Lee A. Armstrong
Mark R. Seiden
JONES DAY
250 Vesey Street
New York, New York
Tel: (212) 326-3939
Fax: (212) 755-7306
Email: laarmstrong@jonesday.com
Email: mrseiden@jonesday.com

Thomas Demitrack
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

Jeffrey R. Johnson
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Tel: (202) 879-3939
Email: jeffreyjohnson@jonesday.com

*Counsel for Defendant Sirius XM Radio LLC*

## CERTIFICATE OF COMPLIANCE

The foregoing Memorandum of Law complies with the type volume limitation set forth in Local Rule 7.1(B)(4). It contains 6961 words, excluding the case caption, tables, and signature block, according to the word-count function of the word-processing system used to prepare it.


*/s/ Lee A. Armstrong*
Lee A. Armstrong

*Counsel for Defendant Sirius XM Radio LLC*